## Case No. 13,226.
### SPEED v. SMITH.

[10 Int. Rev. Rec. 157; 3 Am. Law Rev. 779; [1] 16 Pittsb. Leg. J. 219; 2 Am. Law T. Rep. U. S. Cts. 149.]

Circuit Court, S. D. Mississippi. 1869.

WAR—COMMERCIAL RELATIONS—PROCLAMATION OF PRESIDENT—INTERNATIONAL LAW—PROBATE COURTS—JURISDICTION.

1. The proclamation of the president of April 19, 1861 [12 Stat. 1259], did not interdict commercial intercourse between the citizens of the states in rebellion and those of the other states.

2. Contracts made prior to July 13, 1861, were not invalidated by the operation of the principles of international law.

3. Construction of the statute of Mississippi touching jurisdiction of probate courts, guardian ad litem, &c.

HILL, District Judge. This bill in equity was filed by the complainant against the defendants for the foreclosure of a mortgage executed by the defendant, B. D. Smith, on the 1st day of May, 1861, to secure the purchase money by the defendant to complainant for the Lauderdale Springs property, situated in Lauderdale county, in said Southern district.

The pleadings and proof show the following facts: Thomas Adams was the owner in fee of said property and died intestate. Upon his death, the property descended to his three minor children, subject to the right of dower of his widow, who, with her said minor children, returned to Louisville, Ky., to the house of complainant, the brother of the widow, and uncle of the minors. C. H. Minge, a friend of the family, was requested to take out letters of guardianship from the probate court of Lauderdale county, for the minor children, and to procure a decree from said court, and sell said property, as it was going into dilapidation and waste, being valuable only as a watering place and summer resort for health and pleasure. The letters were granted, decree obtained, and sale made as requested; the purpose being to transfer the proceeds to Louisville, to be placed under the control of the mother of the minors, as their guardian. The widow relinquished her right of dower before the sale. The complainant at the sale became the purchaser, at the price $8,000: the sale was confirmed by the court, and deed made by the guardian to complainant. In August, 1860, through said Minge,

acting as his agent, complainant contracted to sell said property to said Smith for the sum of $10,000, payable in three annual instalments, with 8 per cent. interest. It was further agreed in that contract that when complainant executed a deed for the lands and improvements, Smith would execute his notes for the payment of the purchase money and a mortgage on the property to secure the same. Two deeds were made, which were not accepted, for the alleged reason that the acknowledgments were not sufficiently attested; one of which was that the state of Mississippi had ceased to be one of the states in the Union, and the acknowledgment should be made and attested as provided for deeds made in a foreign country. A deed was made in April, 1861, which was accepted, and the notes and mortgage executed by Smith according to said contract. Smith went into possession immediately upon the making of the contract, and remained in possession until October, 1864, when he sold and delivered possession to Hulburt, Sturges, and others. No part of said purchase money was paid in any manner until about the time, or after the sale, by Smith. Smith offered to pay the notes in Confederate treasury notes to Leachman, the attorney employed by Minge to prepare the deeds and to transact the business. The notes and mortgage were to have been sent to complainant at Louisville, Ky., but before it could be done, after their execution, intercourse between Mississippi and Louisville became somewhat hazardous; and they remained in the possession of Leachman, without any instructions from complainant, either to him or Minge, in relation to them. Complainant having engaged actively on the side of the United States in the war then being commenced between the Confederate States and the United States, no further communication was had between complainant and Minge or Leachman until after the close of the war.

When the proposition to pay in Confederate money was made, Leachman declined accepting it, believing that it would be worthless, at least to complainant. Smith threatened that if it was not accepted he would report the debt to the Confederate authorities, and have it confiscated, so that complainant would get nothing. Minge, who was the client of Leachman, directed him to accept it, saying that he had full confidence in the success of the Confederate cause, and would vest it in Confederate bonds, or in the purchase of cotton, and in that way save it for the minor children. Upon this instruction Leachman accepted the Confederate notes at par, and wrote a receipt across the face of the notes, acknowledging payment, and that it was in full satisfaction of the mortgage, and delivered the notes to Smith, but no satisfaction of the mortgage was entered on the record where the mortgage was recorded. The treasury notes received from Smith were paid over to Minge or his agents; what disposition was made of

---

1 [3 Am. Law Rev. 779, contains only a partial report.]

them by Minge is not shown. Minge died soon after the payment was made.

Soon after Hulburt and others purchased from Smith they sold the property to the trustees of the orphans' home, a benevolent association, and were to receive in payment the sum of $50,000 in Confederate treasury notes, but only paid $10,000 in that currrency. The trustees immediately went into possession, having received the bond of the vendors, conditioned that a good and sufficient title should be made upon the payment of the balance of the purchase-money. After the close of the war Rev. Mr. Teasdale, the financial and business agent of the orphans' association, was in the city of Louisville making appeals to the citizens for aid in support of the institution. The complainant called on him, and stated that he had not received payment for the property, and that the trustees had best not make any further payments of the notes given by Smith to him. After this interview Hulburt and others, and the trustees agreed that the remaining purchase-money should be discharged by the payment of $7,-000 in United States treasury notes, a part of which was paid. After complainant had employed counsel to bring this suit, the counsel informed Teasdale, who was still the agent of the trustees, that he was instructed to bring suit to subject the property to the payment of the purchase-money due complainant, and that the trustees had better not make any further payments to Hulburt' and others until the matter was settled. Teasdale stated that the trustees were safe; that they had a good bond for title, and would pay the remainder, which they have since done. Smith has been adjudicated a bankrupt. The bill does not seek a decree against any of the defendants, so as to render them personally liable, but that the amount due shall be paid as the court may direct, and in default that the property be sold, and the proceeds applied to the payment of the amount due. Four points of defence are relied on by defendants.

(1) That the title obtained by complainant at the guardian's sale is defective, for the reason that no guardian ad litem was appointed for the minors, and the report was not made to the first term of the court after the sale, but to a subsequent term.

(2) That the notes and mortgage deed, as well as the deed from complainant, were executed after the commencement of the war between the United States and the Confederate States, and that at the time the complainant, was a citizen and resident of the state of Kentucky, one of the states in the Union, and that said Smith was a citizen and resident of the state of Mississippi, one of the states then engaged in war against the United States, and that according to the law of nations all commercial intercourse was then prohibited between the citizens of the state of Kentucky and Mississippi, and therefore the contract was illegal and void.

(3) That the payment made to Leachman, the attorney for Minge, the alleged agent of complainant. whether or not by complainant's knowledge or consent, was nevertheless a good payment; that is, that it was a complete execution of the contract, and will not now be disturbed.

(4) That the defendants who hold under Smith are bona fide purchasers without notice. and cannot be affected by any equities existing between complainant and Smith. These different points of defence will be considered in the order in which they are stated.

1. The statute does not require in such case the appointment of a guardian ad litem. It requires that the three next of kin to the minors shall be summoned, provided they reside in the state. None such reside in the state; but the court, out of abundant caution, caused publication to be made citing the next of kin. The probate court had full and ample jurisdiction over the estate of the wards, with power to direct a sale of the property if deemed most in interest of the minors, and consequently all the presumptions in favor of the validity of the proceedings must be made in this court that are given to those of other courts of general jurisdiction. It is unlike the special jurisdiction given by statute to the probate court to subject lands descended to the heir-at-law to the payment of the debts of the decedent from whom they descended; in such case all that the statute requires must affirmatively appear from the record. The proceedings of the probate court must be held valid until by proper proceedings they have been set aside. Besides, the parties have not been evicted, and have a warranty of title.

2. The general rule is, that when a war commences between two separate and independent nations, commercial intercourse between the people of the nations so at war is interdicted, and for two reasons: (1) Those of one nation might furnish means to the other to carry on the war; (2) information beneficial to the one and injurious to the other might thereby be imparted. But the government so at war may relax these rules, and when such intercourse is permitted, contracts, otherwise illegal, will be valid.

The late war, being a rebellion by the people of a portion of the states against the government and authority of the United States, only had the effect of interdicting commercial intercourse between the inhabitants of the sections at war, when so declared by the president of the United States, in his proclamation of the 16th of August, 1861, made in pursuance to the act of congress approved the 13th of July, 1861. The proclamation of April 19, 1861, establishing the blockade of the ports of the United States in the states mentioned therein did not interdict commercial intercourse between the citizens of the states in rebellion and those of the other states. That proclamation was for a twofold purpose: (1) to prevent importations without the payment of impost duties; and (2) to pre-

vent the insurgent states from procuring the means to carry on the war. This was putting up the outside fence for the reasons stated, but the partition or cross fence between the states in rebellion and the other states was not put up until the proclamation of August. The deed from the complainant to said Smith was executed in April, 1861, and the notes and mortgage, 1st of May, 1861. At this time, and for some time afterwards, the mails of the United States were transmitted from the St. Lawrence to the Rio Grande. The telegraph communicated the information from New Orleans to Boston. No interference had then been made by the United States with the commerce and trade between the citizens of the different states then engaged in rebellion with those who remained loyal to the Union. The rebellion having been unsuccessful, the citizens of the states who engaged in it are estopped from setting up any act of the assumed new government as a defence to any agreement or contract entered into with a citizen of one of the loyal states otherwise binding and valid. Had the rebellion been a success, then a different rule would have prevailed. From the above principles it will be seen that this point of defence cannot be maintained.

3. There is no evidence that the payment made in Confederate treasury notes was authorized by complainant, or indeed that either Minge or Leachman had received any instruction or had any power to collect the notes in any kind of funds. The testimony is that the notes were to have been sent to complainant in Kentucky. It cannot be supposed that complainant at this time would have consented to such payment. The complainant was then a citizen of Kentucky, engaged on the Federal side of the war, and it is fair to presume was as confident of the failure of the Confederate cause as Mr. Minge was in its success; besides, Smith, before the payment by him, contracted to sell the property, after having had the use of it for over three years, for twice the amount he paid, and those to whom he sold almost immediately sold to the trustees of a charitable institution for about twice the amount they gave, all in the same kind of funds. It is not supposed that this point of defence is seriously made.

4. Hulburt and others, when they purchased from Smith, knew that the legal title to the property had been conveyed to complainant as a security for the payment of the notes given for the purchase money, and also knew the mode of supposed payment, and the means by which the notes were procured by Smith. The presumption from the evidence is that they contracted for the property before the supposed payment was made, and furnished the means so used. They also received from Smith his deed, with warranty of title. The trustees only held bond for title, and made no payment except

the $10,000 in Confederate money, until after having been notified through their financial agent and business manager. Teasdale, complainant, repudiated the transaction between Minge and Smith. To make this defence good, the purchase money must have been paid, and the legal title received without notice of the rights of complainant or his claim thereto. This mortgage deed was duly recorded in the office of the probate clerk of Lauderdale county, and was unsatisfied so far as the record showed, and was constructive notice to the world as to complainant's title. If they rely upon the fact that the notes had been surrendered to Smith, they must be charged with knowledge of circumstances attending it, and which, though it may not have been so intended, must be held in law as a fraud upon the rights of complainant.

Complainant is entitled to the payment of the notes so executed by Smith, or to a decree for the sale of the property, and the proceeds, so far as they may be necessary, applied to such payment.

---

SPEEDEN (UNITED STATES v.). See Case No. 16,366.

SPEEDWELL, The. See Case No. 30.

SPEEDWELL, The. See Case No. 10,252.

SPEER (CROUCH v.). See Case No. 3,438.

SPEER (HALL v.). See Case No. 5,947.